IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


BRANDI M. RISLEY                                              PLAINTIFF

     v.                          CIVIL NO. 5:19-CV-5089

ANDREW M. SAUL,[1] Commissioner,
Social Security Administration                               DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

     Plaintiff, Brandi M. Risley, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claim for supplemental security income (SSI) under the

provisions of Title XVI of the Social Security Act (Act). In this judicial review, the Court must

determine whether there is substantial evidence in the administrative record to support the

Commissioner's decision. See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

     Plaintiff protectively filed an application for SSI on May 10, 2012, alleging an inability

to work since April 7, 2012, due to multiple fractures of the skull, neck, back, left shoulder and

ribs, pneumothorax of the left lung, splenectomy, lumbar spine fusion, and a personality

disorder. (Tr. 53, 54). An administrative hearing was held on September 12, 2013, at which

Plaintiff and a vocational expert testified. (Tr. 26-49). The ALJ issued a written opinion dated

---

[1] Andrew M. Saul, has been appointed to serve as Commissioner of Social Security, and is substituted as Defendant,
pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

January 31, 2014, where he found that the Plaintiff had not been under a disability within the meaning of the Social Security Act. (Tr. 697-707). Plaintiff subsequently appealed the decision to the Appeals Council, who declined to reverse the decision. (Tr. 713-715). Plaintiff then appealed the decision to the United States District Court for the Western District of Arkansas on June 29, 2015. (Tr. 716-718). On January 29, 2016, pursuant to the Commissioner having filed an unopposed motion requesting remand, the United States District Court granted the motion pursuant to "sentence four" of section 405(g) in order to conduct further administrative proceedings and remanded the case back to the Commissioner. (Tr. 720-722). Subsequently, on March 8, 2016, the Appeals Council issued an opinion vacating the previous decision of the Commissioner and remanding the case to the ALJ. (Tr. 726-729).

On November 14, 2016, a subsequent hearing was held at which Plaintiff appeared with counsel and testified. (Tr. 663-678). Barbara Hubbard, Vocational Expert (VE), also testified. (Tr. 678-686). On August 1, 2017, Ms. Hubbard responded to a written interrogatory clarifying that in her professional experience and based on her observation of similar jobs, bilateral overhead reaching would be no more than occasional in the jobs listed for Plaintiff. (Tr. 874). In a written decision dated March 14, 2018, the ALJ found that Plaintiff had severe impairments of multiple fractures (skull, back, neck and ribs), depression, anxiety, and personality disorder. (Tr. 638). However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 638-340). The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR § 416.967(a), except for the following:

> [C]laimant can lift and/or carry ten pounds occasionally and less than ten pounds frequently with push/pull within those same limits, stand and/or walk

> two of eight hours during a normal workday with normal breaks, sit for six
> hours of an eight hour workday with normal breaks. She can climb ramps and
> stairs occasionally; never climb ladders, ropes or scaffolds; and can
> occasionally balance, stoop, crouch or crawl and occasionally reach overhead
> bilaterally. She can perform work where interpersonal contact is incidental to
> the work performed, the complexity of tasks is learned and performed by rote
> with few variables and little judgment involved and the supervision required
> is simple, direct and concrete.

(Tr. 640). With the help of a vocational expert (VE), the ALJ determined that Plaintiff was
unable to perform her past relevant work and that there were jobs that existed in significant
numbers in the national economy that Plaintiff could perform, such as an addresser, a document
preparer, and a table worker. (Tr. 647). Thus, the ALJ concluded that the Plaintiff had not
been under a disability, as defined in the Social Security Act, from May 10, 2012, through the
date of the decision. (Tr. 647).

Plaintiff filed a Petition for Judicial Review of the matter on May 7, 2019. (Doc. 1).
Both parties have submitted briefs, and this case is before the undersigned for report and
recommendation. (Docs. 12, 13).

The Court has reviewed the transcript in its entirety. The complete set of facts and
arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.    Evidence Submitted:

At the 2013 and 2016 hearings before the ALJ, Plaintiff testified that she was born in
1982; that she dropped out of high school in the tenth grade; and that she had obtained her
GED. (Tr. 664). Testimony also showed that Plaintiff had past relevant work as a machine
operator. (Tr. 32, 646).

Prior to the relevant time period, Plaintiff was treated for acute tonsillitis (Tr. 289),
acute pharyngitis, (Tr. 294), dehydration (Tr. 294), and sinusitis (Tr. 294).

On April 7, 2012, Plaintiff arrived at Washington Regional Medical Center emergency department after she was involved in a motorcycle accident. (Tr. 247). Plaintiff was an un-helmeted passenger who was thrown from the motorcycle upon impact and rolled down a 20-foot ravine. (Tr. 247-248). Plaintiff was complaining of severe back pain. (Tr. 248). Plaintiff had an obvious pneumothorax on the left side, intrabdominal fluid with a hematoma on the left upper quadrant, and active extravasation from the spleen. A CT scan of the brain was negative. Additional CT scans of the maxillofacial, the cervical spine, the chest, abdomen and pelvis, showed severe blunt force injury to the thorax and abdomen, including injuries to the spleen, severe L1 fracture, multiple bilateral rib fractures, sternal fracture, scapular fracture, cervical spine fracture, nasal fracture, orbital wall fracture, basilar skull fractures, and the possibility of an aorta injury. (Tr. 248-249). Plaintiff underwent immediate surgery on her abdomen to remove her spleen, and Dr. Kenneth Tonymon performed an L1 corpectomy with reconstruction of the anterior column from T12 to L1 and an anterior instrumentation T12 to L2 utilizing plates and screws. (Tr. 249, 253). Dr. Tonymon also performed a T11, T112, L1, L2, and L3 posterolateral intertransverse arthrodesis utilizing an allograft bone sponge and a stem cell tissue repair solution; a posterior instrumentation at T11, T12, L2, and L3 using a screw and rod system; and intraoperation neurophysiological monitoring. (Tr. 255). A CT angiogram of Plaintiff's chest showed no evidence of an acute periaortic hemorrhage but did show abnormal contour of the anterior descending aorta at the aortic isthmus with a slight increase in diameter. (Tr. 336). It also showed small to moderate residual pneumothorax and subcutaneous emphysema along the left chest wall, as well as posterior lung contusions with bilateral rib fractures. (Tr. 336). Lastly, it showed a fracture of the left scapular body without articular extension and a nondisplaced fracture of the manubrium of the sternum. (Tr. 337). A

4

transesophageal echocardiogram was performed on April 9, 2012, showing no evidence of aortic dissection or aneurysm, no valve abnormalities, and normal left ventricular function. (Tr. 362). The next day, Dr. Jon Sexton evaluated Plaintiff while she was sedated. (Tr. 377). His notes indicate that Plaintiff had a history of IV drug abuse and narcotic abuse. (Tr. 377). Dr. Sexton opined that Plaintiff needed continued ventilatory support, continued intravenous pain medication, and further testing.  (Tr. 378-379). Dr. Paul Farris, an ENT, examined Plaintiff that day as well and noted that she needed a Merocel pack (with non-absorbable nasal packing material) for her nasal fracture and an external splint. (Tr. 380).

A chest x-ray on April 10, 2012 showed a haziness of the right lung base with possible small pleural effusion developing and diminishing subcutaneous emphysema in the left chest wall; however, a repeat x-ray on April 13 showed improvement of the right lung base. (Tr. 346-347, 350-351). An additional x-ray on April 20 showed mild bibasilar airspace disease but no evidence of pneumothorax. (Tr. 343). On April 22, Plaintiff's x-ray showed some airspace disease at the left lung base consistent with atelectasis, but no pneumothorax. (Tr. 356).

On April 29, 2012 through May 1, 2012, Plaintiff was at Washington Regional Medical Center for fever and wound drainage from the upper portion of her abdominal. (Tr. 222).  An April 29, 2012, CT scan of Plaintiff's abdomen and pelvis showed bilateral pedicular screw and rod fixation from T11 to L3 with corpectomy changes at L1 and   metallic cage; anterolateral plate and screw fixation from T12 to L2; a focal fluid collection at right posterior L3 level measuring 3 x 2.5 cm; no significant RIM enhancement; possible postoperative fluid collection verses focal abscess; residual left hydropneumothorax with associated left lower lob atelectasis; and splenectomy changes with no focal fluid collection or air in the abdomen. (Tr. 237-238). An April 30, 2012, ultrasound of Plaintiff's bilateral lower extremity deep veins was

normal. (Tr. 239).  A CT scan on April 30 of Plaintiff's abdomen and chest revealed: "1. Post-op fever of unknown etiology. Favor urinary tract infection because of patient's subjective symptoms. DVT, LEFT pulmonary empyema and sinusitis could also represent sites for infection. 2. Small fluid collection in the intermuscular region on the right-hand side; doubt infection." (Tr. 226).  As a result, doctors concluded there was no obvious abscess in Plaintiff's abdomen. (Tr. 223). Hospital records indicated at the previous hospital visit Plaintiff had MRSA in her sputum.  Further testing was done to determine the cause of her fever. (Tr. 230). Plaintiff was discharged with antibiotics. (Tr. 222).

On May 15, 2012, Plaintiff saw Dr. Jon Berry for a follow up after her accident. Plaintiff reported that she was doing well and had not had any fever.  She was experiencing left chest wall pain. (Tr. 375). Plaintiff was encouraged to follow up with the neurosurgeon. (Tr. 376).

On May 16, 2012, Plaintiff underwent a CT scan of her cervical spine, which revealed the following: nondisplaced incompletely healed fracture of the spinous process of C4; unchanged appearance of small avulsion fracture of the posterior aspect of the right superior C5 articular facet; no new fracture was identified; and healing left posteromedial second and third rib fractures and transverse process fractures. (Tr. 218).

On May 17, 2012, Plaintiff was seen at Washington Regional Medical Center with complaints of nausea, vomiting, diarrhea, and dehydration. (Tr. 209). She was assessed with acute gastroenteritis, a urinary tract infection, and discharged with medication. (Tr. 211, 213).

On May 30, 2012, Plaintiff had a follow up at the NWA Neuroscience Institute after her lumbar fusion. (Tr. 415). Plaintiff's physical examination was normal, including her gait

6

and station. Plaintiff's x-ray of her cervical spine showed normal alignment with poor visualization of previously noted nondisplaced C4 spinous process fracture and C5 superior articular facet fracture. (Tr. 205). An x-ray of Plaintiffs' lumbar spine showed combined anterior and posterior fusion procedure from T11 to L3, status post L1 corpectomy with no change in alignment. (Tr. 206). She was instructed to begin vitamin D supplements and observe proper neck posture when texting. She could discontinue the use of her cervical collar. (Tr. 416).

On May 9, 2012, Plaintiff saw Dr. Wayne Brooks for pain control. (Tr. 412). Clinic notes indicate her pain was controlled "somewhat" and that she had started physical therapy the day before. Plaintiff complained that the medication did not completely resolve her pain and that it did not last long enough. Plaintiff's anxiety and polysubstance abuse were noted. Dr. Brooks noted that Plaintiff was complaint with her treatment plan and that the benefits of pain management outweighed the side effects and other risks. (Tr. 412). Her prescriptions for morphine ER, morphine IR, and clonazepam were refilled. (Tr. 412).

On May 16, 2012, Plaintiff presented at Washington Regional Medical Center for nausea, vomiting, diarrhea, and dehydration. Plaintiff also complained of abdominal pain. (Tr. 994). She was assessed with acute gastroenteritis and a urinary tract infection. Physician notes indicated that Plaintiff was asking for scans of her spine initially because she was experiencing back and neck pain after episodes of vomiting. (Tr. 996). When x-rays were ordered, Plaintiff refused them, saying they were "silly." She stated that x-rays were not needed and that she said she wanted to leave the emergency department. (Tr. 996). Ultimately, a CT scan of Plaintiff's cervical spine was performed which revealed no new findings. (Tr. 1004). Plaintiff

was discharged, encouraged to start fluids, and encouraged to follow up with her primary care physician. (Tr. 996).

In June of 2012, Plaintiff returned to Dr. Brooks for pain control. (Tr. 409-413. On June 14, Plaintiff was on morphine ER, morphine IR, and clonazepam for pain. (Tr. 411). She reported that her pain was worst in the middle of her back and that she had fallen down the stairs since her last visit. She also reported depression and weight changes, but that her sleep pattern had improved. (tr. 411).

On August 16, 2012 through August 31, 2012, Plaintiff was in Washington Regional Medical Center for treatment for abdominal pain, nausea and vomiting. (Tr. 443). Dr. Berry's notes indicated plaintiff was a smoker and that she was taking narcotics for her back pain. Plaintiff's constipation was treated conservatively, but without success. She ultimately underwent an operation for treatment of her blockage and adhesions. Upon discharge, Dr. Jon Berry diagnosed her with a partial bowel obstruction and status post laparoscopic lysis of adhesions. (Tr. 443).

On August 22, 2012, Dr. Jonathan Norcross, a non-examining medical consultant, completed a Physical RFC Assessment, where he found Plaintiff was capable of light work with postural limits and occasional bilateral overhead reaching limits. (Tr. 429).

On September 14, 2012, Plaintiff underwent a Mental Diagnostic Evaluation by Dr. Terry Efird, Ph.D. (Tr. 431-435). Plaintiff reported chronic pain from her motorcycle accident, memory issues, and a history of drug use. (Tr. 431). As for her drug history, she reported using methamphetamine daily for ten years with sporadic intravenous usage. She went to a residential drug treatment facility in 2010, which was court-ordered and part of her probation.

She denied use of methamphetamine since 2010. She reported starting to use "oxymorphone" around February 2012 and used it intravenously on a regular basis. She used that substance until her accident.  Plaintiff reported symptoms of depression and anxiety, which she had experienced for years.  (Tr. 431-432). She stated that her mental symptoms improved after she stopped using methamphetamine and that she relapsed a few months prior to the motorcycle accident. (Tr. 432). Plaintiff denied inpatient and outpatient psychiatric treatment, other than drug rehab.  Plaintiff stated she was under the care of a pain management physician and on pain medication.  She also stated that she had been on psychiatric medication for the last four to six months and that it was beneficial. Plaintiff lived with her mother, her three children, and a fourth child with whom she had joint custody. Self-care tasks and household chores were impacted by her physical limitations. Plaintiff reported going to prison in 2004 for one incident of drug charges. Plaintiff reported that she had little work history. (Tr. 432). Dr. Efird observed Plaintiff's "rigid" back brace; that she was appropriately dressed and groomed; that her mood was sad and anxious; that her speech was a bit fast; that her thoughts were primarily logical, relevant and goal directed; that based on her knowledge, she appeared to be around the low average range of intellectual functioning. (Tr. 433). Dr. Efird diagnosed Plaintiff with Axis I disorders of depression, anxiety, and opiate dependence in partial remission; Axis II personality disorder; and a GAF score of 45-55. (Tr. 434). Plaintiff reported that she would go to church at times, spend time on Facebook once a week, and visit with a neighbor on a daily basis. (Tr. 434).  Dr. Efird observed that Plaintiff communicated and interacted in a reasonably socially adequate manner; communicated in reasonably intelligible and effective manner, with a tendency to qualify responses at times; had the capacity to perform basic cognitive tasks required for basic work like activities; appeared able to tract and respond adequately for

purposes of the evaluation; completed most tasks and showed no remarkable problems with persistence; and completed most tasks within an adequate time frame, indicating the ability to perform basic work-like tasks within a reasonable time frame. (Tr. 434-435).

On September 17, 2012, Dr. Abesie Kelly, Ph.D., a non-examining medical consultant, completed a Mental RFC Assessment of Plaintiff, where she found that Plaintiff was able to perform work where interpersonal contact was incidental to work performed, e.g. assembly work; complexity of tasks was learned and performed by rote, few variables, little judgment; and supervision required was simple, direct, and concrete (unskilled). (Tr. 440). Dr. Abesie also completed a Psychiatric Review Technique finding Plaintiff had mild restriction of activities of daily living, moderate limitations in the area of difficulties in maintaining social functioning, moderate limitations in the area of difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation each of extended duration. (Tr. 479). She assessed Plaintiff with depressive disorder, anxiety disorder, personality disorder, and substance addiction disorder. (Tr. 472-477).

A CT scan of Plaintiff's lumbar spine on October 2, 2012, showed no acute findings; a small left pleural effusion with left basilar airspace disease; mild left paravertebral soft tissue thickening at T11 through L2, likely postoperative; bilateral mild hydronephrosis; and retroperitoneal lymphadenopathy, unchanged. (Tr. 501-502). Plaintiff's lumbar spine x-ray showed stable appearance of anterior and posterior spine fixation with L2 corpectomy and expandable vertebral body cage. (Tr. 504).

Also, on October 2, 2012, Dr. Paul Rankin, a non-examining medical consultant, completed a Physical RFC Assessment of Plaintiff, where he affirmed the August 22, 2012

assessment of Dr. Norcross of light work with postural limits and occasional bilateral overhead reaching limits. (Tr. 486).

On October 15, 2012, Dr. Kenneth Tonymon completed a Medical Source Statement wherein he opined Plaintiff could frequently lift and/or carry ten pounds; could stand and/or walk a total of two hours in an eight-hour day; could sit a total of two hours in an eight-hour day; could push and/or pull up to ten pounds; could never climb, balance, stoop, and bend; could reach, handle, finger, feel, see, hear and speak without limitation; and could not be exposed to heights. (Tr. 488). Dr. Tonymon opined that Plaintiff would be absent from work more than three times a month.  He stated that her limitations were expected to remain until April of 2013.  (Tr. 489).

On October 17, 2012, Plaintiff was seen at Washington Regional Medical Center by Dr. John Kendrick for a monthly follow up visit for controlled medications and for complaints of abdominal pain and a hernia above the umbilicus. (Tr. 494). Plaintiff's neurological examination was grossly normal and DTR's were bilaterally equal.  (Tr. 496).  Two days later, on October 19, Plaintiff underwent hernia repair surgery by Dr. Kendrick. (Tr. 497).

Plaintiff was seen at Washington Regional Medical Center on December 1, 2012 for pain in the mid back area. (Tr. 532). Imaging of her abdomen and low back showed only postoperative changes. (Tr. 540-541). She was assessed with low back pain, constipation, and a urinary tract infection. (Tr. 534).

Plaintiff returned to Washington Regional Medical Center where she was admitted through the emergency room on December 6, 2012. (Tr. 623). Plaintiff had experienced vomiting, profound dehydration, and was placed on IV antibiotics.  (Tr. 623). When her

symptoms failed to improve, Plaintiff was taken into surgery on December 10 where she underwent lysis of obstructing adhesions. She was positive for MRSA on routine screening cultures and was suffering from malnutrition.  She continued to improve post-surgery and was discharged on December 15, 2012, with diagnoses of acute small-bowel obstruction secondary to adhesions, urinary tract infection with pyelonephritis secondary to staphylococcus epidermidis, protein calorie malnutrition, pain management for chronic back pain, and anxiety. (Tr. 622-623). Plaintiff was given a specific diet and wound and activity instructions. (Tr. 623).

On January 27, 2013, Plaintiff presented at Washington Regional Medical Center with left hydronephrosis, an obstruction, and left psoas with a history of surgeries from a 2012 accident.  Records indicate Plaintiff had undergone 2 small bowel obstructions since then.  That day, Plaintiff had a white cell count of 32,000, an elevated platelet count, and a fever. (Tr. 624). Plaintiff was placed on IV medication; her left psoas abscess was aspirated; and the fluid was sent for culture. The culture again showed MRSA. (Tr. 624). On January 30, Plaintiff underwent a surgical procedure by Dr. Kendrick to drain a retroperitoneal abscess in the bed of her 12th rib. (Tr. 521). During the procedure, Dr. McWhorter also placed a double-J stent in the kidney and bladder. (Tr. 522-523). On February 8, a drain was placed for the psoas abscess.  MRSA was still detected from cultures. The drain was removed on February 13, and the fluid from the drain contained fungus.  She was placed on Diflucan to treat the fungus. Doctors consulted and agreed that the hardware could not be removed because bone had grown through it. (Tr. 624). Infectious disease doctors ordered six weeks of antibiotic therapy and a one-year suppressive dose of antibiotic. (Tr. 625). Doctors were unable to send Plaintiff home with a PICC line due to her history of drug addiction.  Finally, on March 3, Plaintiff began to improve, to gain weight, and feel better; however, she had another fever spike, which pushed

her discharge to March 13, 2013. She was instructed to stay on the doxycycline for the next year and to follow up with infectious disease Doctor, Mark Stillwell. (Tr. 625).

On March 22, 2013, Plaintiff had a CT of her abdomen and pelvis as a result of the fever she was experiencing. (Tr. 524). The scan showed a small amount of fluid suggesting an abscess, constipation, and left nephrolithiasis with a stable position of the left ureteral stent. (Tr. 525).

On April 2, 2013, Plaintiff presented at Washington Regional Medical Center with complaints of pain and tenderness to the low back and chest pain. (Tr. 548). Emergency department records indicate Plaintiff was a smoker with a history of past methamphetamine use. (Tr. 549). Plaintiff's CT scan of her lumbar spine showed a possible recurrent lumbar abscess. Her white cell count was also high. She was admitted for additional testing. Her lumbar and thoracic spine x-rays showed normal alignment and bipedicular screws and rod fixation of the thoracolumbar spine. (Tr. 571-572). A three-phase bone scan of the lumbar spine showed no evidence of osteomyelitis. (Tr. 573). Plaintiff improved in a couple of days, was discharged on April 5 and was to remain on an antibiotic until a final determination was made as to whether or not she had acute osteomyelitis in the lumbar spine with probable infected hardware. (Tr. 566). She was also still on pain management medication for her back. (Tr. 568).

On April 8, 2013, Plaintiff presented at Washington Regional Medical Center for complaints of abdominal pain in the suprapubic region with associated nausea and vomiting. (Tr. 591). A CT scan of the abdomen and pelvis did not show nephrolithiasis or ureterolithiasis

13

but showed constipation and postoperative change of the lumbar spine resulting in marked artifact. (Tr. 526).

On May 10, 2013, Plaintiff returned to Washington Regional Medical Center with complaints of low back pain. (Tr. 608). Records noted that Plaintiff smoked cigarettes and had a history of drug use. (Tr. 608). A CT of Plaintiff's lumbar spine showed no acute findings. It also showed persistent left paraspinal soft tissue fullness; however there appeared to be decreased left posterior perinephric fluid and a small amount of free fluid in the left pelvis. (Tr. 617). Plaintiff was diagnosed with a urinary tract infection and discharged home with medication the same day. (Tr. 610).

On May 28, 2013, Plaintiff was seen at WR Ozark Urology for a follow up after her history of UTI's and stent placement.  Plaintiff reported that the stent was causing discomfort. (Tr. 513). Dr. Richard McWhorter assessed her with nephrolithiasis and removed her stent. (Tr. 515).

A June 10, 2013, x-ray of Plaintiff's thoracolumbar spine showed stable anterior and posterior lumbar spine fixation with L1 corpectomy and expandable vertebral body cage. (Tr. 621).

On June 11, 2013, Plaintiff presented at Northwest Medical Center emergency department with complaints of arm pain and swelling on her right forearm. (Tr. 1532). Records indicate Plaintiff was a smoker. (Tr. 1533). She was diagnosed with lymphangitis and thrombophlebitis; however, her ultrasound of her arm was negative for deep vein thrombophlebitis. (Tr. 1534). She was prescribed antibiotics and told to continue her current medications.  When hospital staff was verifying Plaintiff's most recent medications with her

14

pharmacy, Plaintiff informed staff that she wanted to leave the hospital against medical advice. Plaintiff was informed of the risks, but she left anyway.  No prescriptions were given to Plaintiff that day. (Tr. 1543).

Plaintiff presented at MediServe Clinic on June 28, 2013, for back pain and noted her symptoms are relieved by pain medication and rest. (Tr. 516).  Plaintiff called MediServe that same day requesting additional pain medication and a referral to pain management.  Clinic notes indicate the referral to pain management had already been sent out. (Tr. 1353). Plaintiff called MediServe Clinic again on July 9, 2013, requesting stronger pain medication. She was told no more narcotics would be prescribed. (Tr. 1353).

Dr. Kendrick completed a second Medical Source Statement on July 19, 2013, wherein he opined that Plaintiff could frequently and occasionally lift and/or carry less than ten pounds; could stand and/or walk one hour in an eight hour day; could sit one hour in an eight hour day; could never push and/or pull; could never climb, balance, kneel, crouch, and bend; could occasionally stoop; and had limitations with reaching. (Tr. 518-519). Dr. Kendrick noted the plates and screws and osteomyelitis in Plaintiff's back that were the source of her limitations. (Tr. 519). He opined that Plaintiff would be absent from work more than three times a month and stated that Plaintiff's limitations were expected to last indefinitely.  (Tr. 520).

On July 26, 2013, Plaintiff returned to Dr. Samuel Price at MediServe, a Mana Clinic, for a follow up on her back pain. Her anxiety and prescription for klonopin and oxycodone were noted. (Tr. 1351).

On August 13, 2013, Plaintiff arrived at Washington Regional Medical Center emergency department for evaluation of her low back pain. Plaintiff reported that she fell a

15

couple of days ago and her pack pain had worsened. (Tr. 1287).  However, records indicate Plaintiff was not making eye contact with health care providers and was playing on her phone the whole time the doctor was talking to her.  (Tr. 1292). Plaintiff then told doctors that her pain mediation was no longer taking care of her back pain.  (Tr. 1292). A CT scan of her abdomen and pelvis showed mildly limited examination secondary to a metallic artifact arising from thoracolumbar spine fixation changes, but no focal fluid collection in the abdomen, pelvis or paraspinous muscle suggesting abscess, and a moderate amount of stool throughout the colon representing underlying constipation. (Tr. 1294). Plaintiff was discharged home with a diagnosis of chronic back pain. (Tr. 1289).

Plaintiff saw Dr. Price on August 21, 2013, for worsening back pain. Her anxiety and inability to sleep were also noted. (Tr. 1347).  Her prescription for klonopin, oxycodone and soma were noted. (Tr. 1348).

On August 29, 2013, Plaintiff returned to Washington Regional Medical Center emergency department with complaints of pain in her lower back. (Tr. 1007). Plaintiff reported numbness in her legs and was unable to sit still due to pain.  (Tr. 1011). Plaintiff was able to ambulate with a steady gait. (Tr. 1011). A CT scan of her cervical spine showed no acute osseous findings, spondylosis of the lower lumbar spine with questionable displacement of the right S1 nerve root, and left adnexal partially imaged fluid collection. (Tr. 1014).  She was diagnosed with lumbar strain and chronic back pain. (Tr. 1008). She was instructed to continue her current medication, follow up with Dr. Kenrick, rest, and use heat on her back. (Tr. 1009).

On September 23, 2013, Plaintiff called MediServe asking for refills on her oxycodone because her purse had been stolen with her mediation was inside.  Physicians at MediServe would not refill the prescription. (Tr. 1342).

Plaintiff saw Dr. Price on October 15, 2013, for her anxiety and back pain. (Tr. 1339). Plaintiff's anxiety symptoms had improved but she still had some difficulty functioning. Her back pain was mild to moderate but was also stable.  (Tr. 1339). Plaintiff's current medication included klonopin, oxycodone, and soma. (Tr. 1340).

On October 27, 2013, Plaintiff arrived at Washington Regional Medical Center emergency department with complaints of back pain that was worsening despite her narcotic medication. (Tr. 1299). Doctor notes revealed that Plaintiff became very upset when she was informed that she would be prescribed Toradol and, and she walked out into the hall screaming and crying.  She indicated she was going to another emergency room and left.  Plaintiff was noted to be ambulating well and left against medical advice. (Tr. 1302).

On November 2, 2013, Plaintiff presented at Washington Regional Medical Center emergency department for pain in her low back. (Tr. 1162). Plaintiff was discharged with back pain and instructed to follow up with her neurosurgery clinic. (Tr. 1164). A CT of the lumbar spine showed an increased lucency surrounding the later screw of the anterior plate at LL2, suggesting loosening or underlying hardware infection.   (Tr. 1169).

On November 11, 2013, Plaintiff saw Dr. Price for back pain that was mild to moderate. Plaintiff reported that the hardware in her back is "loose."  (Tr. 1335). Plaintiff's current medications were oxycodone, soma, and klonopin. (Tr. 1337).

17

On November 24, 2013, Plaintiff arrived at Washington Regional Medical Center emergency department with complaints of abdominal cramping, nausea, vomiting, and dehydration. (Tr. 1113). Plaintiff was diagnosed with chronic back pain, narcotic withdrawal, nausea, and vomiting. (Tr. 1115).

On December 11, 2013, Plaintiff saw Dr. Price for musculoskeletal pain. (Tr. 1330). Plaintiff's anxiety was also noted.  Plaintiff's medications included soma, klonopin, and oxycodone. (Tr. 1331).

On January 11, 2014, Plaintiff presented at Washington Regional Medical Center emergency department for an evaluation of left flank pain. Plaintiff was tearful and was repeatedly asking for something for pain.  Plaintiff was requesting something "stronger than morphine" and was apologetic because last time she was in the emergency department she saw the same physician and refused the ordered CT scan.  Plaintiff left that day against medical advice when she did not like what she was prescribed. (Tr. 1139).  Records indicate Plaintiff had been a smoker for fifteen years. (Tr. 1140).  A CT scan showed posterior fusion of T11 through L3 and anterior fusion of T12 to LL2 and placement of a left ureteral stent.  (Tr. 1188). After a CT scan, Plaintiff was assessed with left flank pain and hydronephrosis and discharged with pain medication. (Tr. 1143-1144, 1153).

On January 14, 2014, Plaintiff aw Dr. Price for her back pain and anxiety. Plaintiff's back pain was assessed at moderate to severe, but stable.  Her initial symptoms of anxiety had improved, but she was still experiencing symptoms. (Tr. 1327). Plaintiff's oxycodone, soma and klonopin were noted. (Tr. 1328).

On January 17, 2014, Plaintiff had an x-ray of her abdomen, which showed mild left hydronephrosis possibly due to a degree of chronic ureteropelvic junction obstruction. (Tr. 1005).

On February 7, 2014, Dr. McWhorter placed a stent between Plaintiff's bladder and her kidney as treatment for her hydronephrosis.  (Tr. 1284).

On February 17, 2014, Plaintiff returned to Washington Regional Medical Center emergency department with flank pain on the left side. (Tr. 1171). Records indicated Plaintiff was in the emergency room last month and had left hydronephrosis with what appeared to be a stricture of the ureter. Plaintiff had no nephrolithiasis at the time and had a ureteral stent placed by Dr. McWhorter. (Tr. 1171). A current CT scan showed no appreciable hydronephrosis or ureteral calculi and likely loosened hardware at L2 with sclerotic appearance of vertebrae similar to recent CT concerning for osteomyelitis. (Tr. 1175). Plaintiff was assessed with acute pyelonephritis, lumbar back lumbar, and spinal hardware malfunction. (Tr. 1175).

Also, on February 17, 2014, Plaintiff saw Dr. Price for anxiety and back pain. (Tr. 1320).  Dr. Price noted some improvement of Plaintiff's anxiety symptoms, but that she was still having some difficulty functioning. Plaintiff reported that her back pain was fluctuating. (Tr. 1320). Plaintiff's oxycodone, klonopin and soma were refilled.  (Tr. 1321).

On February 21, 2014, Plaintiff returned to WR Ozark Urology for a post-op follow up appointment after the stent procedure. Plaintiff reported that the stent was "irritating" and asked for "blue pills." (Tr. 1423). Plaintiff was given a Toradol injection that day. (Tr. 1423).

Plaintiff was instructed to stay on her mediation, given additional pain medication, and given a referral for pain management.  (Tr. 1425).

On March 25, 2014, Plaintiff arrived at Washington Regional Medical Center emergency department for an evaluation of abdominal pain, specifically in the lower right quadrant. (Tr. 1126). Hospital records indicated that Plaintiff was extremely anxious; that it was difficult to get any history from her; and that she struggled to focus on the questions asked of her. (Tr. 1132). A CT of her abdomen showed markedly limited examination secondary to metallic artifact and a large amount of stool throughout the colon. (Tr. 1137). Plaintiff was discharged home the same day. (Tr. 1130).

On April 3, 2014, Plaintiff saw Dr. Mary Daut at Optimal Pain and Wellness for an evaluation and consultation for pain management of her low back.  Dr. Daut noted her accident; the MRSA in the hardware in her back; and the fact that she was fired from a previous pain doctor for drug shopping.  That day, Plaintiff claimed that her roommate had stolen some of her pain medication, and thus, she was out of pain medication for the month. Plaintiff reported that her pain was constant; that it radiated to her shoulder; and that it was of the burning, sharp, stabbing, and tingling quality. (Tr. 890). Plaintiff reported that her pain interfered with her general activity, normal work routine, sleep, and ability to walk. Plaintiff was currently in physical therapy and on bedrest with no improvement. (Tr. 890). Plaintiff was started on methadone and oxycontin for pain management for her backache, chronic pain, and lumbar failed back surgery. (Tr. 892).

On May 1, 2014, Plaintiff returned to Dr. Daut. Plaintiff reported she was out of klonopin and that her PCP would not refill it because of her pain contract with Dr. Daut.

Plaintiff reported some anxiety because she was out of her Klonopin, but said her pain was otherwise under good control.  (Tr. 886). She was assessed with backache, chronic pain, and lumbar failed back surgery. (Tr. 888).  Plaintiff called Dr. Daut's office later that day and spoke to a nurse. (Tr. 1461). Plaintiff insisted that the doctor's office had calculated incorrectly and as a result, Plaintiff was out of her pain medication.  Plaintiff hung up on staff when she did not get additional medication. (Tr. 1461).

On May 22, 2014, Plaintiff saw Dr. Stephen Hennigan where she was assessed with chronic osteomyelitis and possible carrier of MRSA.  Dr. Hennigan suggested Plaintiff resume Bactrim and stay on it.  (Tr. 881).

On June 10, 2014, Plaintiff returned to Dr. Price with complaints of anxiety and back pain. Plaintiff reported difficulty functioning due to anxiety and related symptoms and worsening pain in her back due to chronic infection in the spine hardware. (Tr. 1316). Dr. Price assessed Plaintiff with anxiety and back pain.  (Tr. 1318). Dr. Price gave Plaintiff a note for school or work for June 10, but she was cleared on June 11. (Tr. 1319).

On July 29, 2014, Plaintiff saw Dr. Daut her chronic back pain. (Tr. 882). Plaintiff reported that she was able to function and that her pain was adequately controlled. Plaintiff was pleased with her medication regimen and did not have any new side effects or excessive drowsiness from the medication. (Tr. 882). Dr. Daut noted that Plaintiff was a smoker. (Tr. 883). She was assessed with backache, chronic pain, and lumbar failed back surgery. (Tr. 884).

On August 7, 2014, Plaintiff arrived at Washington Regional Medical Center emergency room with complaints of left flank pain. (Tr. 1212). Plaintiff was assessed with a

urinary tract infection and hydronephrosis. Plaintiff was to drink plenty of fluids and follow up with Dr. McWhorter's office. (Tr. 1214).

On September 13, 2014, Plaintiff returned to Washington Regional Medical Center emergency department for complaints of flank pain on the left side. (Tr. 983). Plaintiff's abdomen/pelvis CT scan showed no kidney stones, no obstruction, and no hydronephrosis. Doctors noted that Plaintiff was requesting refills on her chronic pain medications, which would not be refilled in the emergency department. Plaintiff was discharged home as her flank pain was of an uncertain cause. (Tr. 985).

A hand-written note on Dr. Regina Thurman's September 23, 2014, office notes, indicated that the Harp's Pharmacy had called to let Dr. Thurman's office know that Plaintiff had received an additional prescription from Dr. Kevin Earl for #90 oxycodone that had been forged to 180. (Tr. 1475).

On October 7, 2014, Dr. Daut authored a letter to Plaintiff informing her that Dr. Daut would no longer see her for pain management due to a breach of the narcotic contract. (Tr. 1474).

On November 12, 2014, Plaintiff arrived at Washington Regional Medical Center emergency department with complaints of left-sided flank pain. (Tr. 963). Plaintiff's white cell count was high, but physicians could not identify any acute issue. They instructed her to follow up with her primary care physician and a urologist for a recheck. (Tr. 965). She was diagnosed with left flank pain. (Tr. 965).

On December 8, 2014, Plaintiff presented at Dedicated Pain Management to establish care. Plaintiff's current pain medications were adjusted. (Tr. 1361). She was prescribed clonazepam and oxycodone. (Tr. 1358).

On January 5, 2015, Plaintiff returned to Dedicated Pain Management to follow up and for medication refills. Plaintiff requested that an extended release pain medication be added to her regimen. Clinic notes also indicate that Plaintiff reported having her pain medication stolen. (Tr. 1360).

On September 24, 2015, and October 22, 2015, Plaintiff saw Dr. Paul Diadone for pain in her low back, radiating to her upper spine, down her legs, and her neck at times. (Tr. 1389, 1398).

On December 9, 2015, Plaintiff saw Dr. Michael North as a new patient. She requested a referral for pain management. She reported currently taking oxycodone and methadone and stated that since being on those medications, her blood pressure had increased, and her pain had worsened. (Tr. 1528). Dr. North agreed to write her a prescription for one month of pain medication but stated that he would not be able to write additional prescriptions. (Tr. 1529).

On February 9, 2016, Plaintiff returned to Dr. North for her chronic back pain. (Tr. 1526). Plaintiff requested another pain management referral, as her last referral was to Dr. Piechal, who declined to accept her as a patient. (Tr. 1527). Dr. North agreed to give her a one-month supply of oxycodone and a referral to another pain management clinic, but he would not be able to continue to write prescriptions for pain medication. (Tr. 1527).

On March 25, 2016, Dr. North instructed Plaintiff to continue her current medications and proceed with the referral to Dr. Luo. (Tr. 1526).

On July 13, 2016, Plaintiff saw Dr. Cathy Luo for her lower and upper back pain. (Tr. 1381). Plaintiff reported that her previous doctor, Dr. North, was prescribing oxycodone for her but that he left the clinic and she was unable to find another physician to prescribe it for her. (Tr. 1381). Dr. Luo noted that Plaintiff had not been to physical therapy in the last year. (Tr. 1382). Plaintiff was assessed with displacement of lumbar intervertebral disc without myelopathy; lumbar post-laminectomy syndrome; post-laminectomy syndrome of the thoracic region; and chronic pain syndrome. (Tr. 1383). Dr. Luo recommended different doses of pain medication and Plaintiff refused, stating that she did not want her medication changed.  As a result, Dr. Luo stated that she would not be able to be Plaintiff's physician.  (Tr. 1384).

On August 31, 2016, Plaintiff saw Dr. Ornette Gaines for pain management at Optimal Pain and Wellness.  (Tr. 1481)). Clinic records show Plaintiff was fired by Dr. Daut in 2014. Plaintiff was requesting a refill of her current medications, dilaudid and oxycodone. Plaintiff indicated that she understood that this was to be a family medicine appointment.  (Tr. 1481). Plaintiff was assessed with back pain and anxiety, and Dr. Gaines informed her that she would have to be referred to Dr. Thurman for pain management. (Tr. 1484).

On September 1, 2016, Plaintiff returned to Northwest Medical Center emergency room with complaints of back pain that was radiating down her legs and up her spine and neck. (Tr. 1546). Plaintiff claimed she was out of her oxycodone at the time and that she had not been able to get established with a pain specialist. (Tr. 1547). Plaintiff was advised that the emergency department did not treat chronic pain syndrome and that she needed to follow up with her primary care physician to establish with a pain specialist.  Plaintiff was prescribed Tramadol.  (Tr. 1548-1549).

On September 28, 2016, Plaintiff returned to Dr. Gaines.  Plaintiff had been turned down by Dr. Thurman for pain management, and Plaintiff was asking to restart her pain medication. (Tr. 1497). Plaintiff was given a five-panel probation drug screen and prescribed valium and oxycodone. (Tr. 1500).

On October 26, 2016, Plaintiff saw Dr. Gaines again. That day, Dr. Gaines noted that Plaintiff was doing "fine" and that she was asking to "go up one on the oxycodone." (Tr. 1503). Plaintiff was given a routine drug screen, and her medication was refilled.  (Tr. 1506).

Plaintiff returned to Dr. Gaines on November 21, 2016, where she reported that she currently had a toothache and wanted antibiotics. (Tr. 1511). Plaintiff underwent a routine drug screen and was given antibiotics and refills of her current medications. (Tr. 1514).

On January 9, 2017, Plaintiff saw Dr. Gaines for a follow up.  Dr. Gaines noted that Plaintiff was "doing fine." Plaintiff reported that her anxiety had increased but that she was able to function. (Tr. 1521). Dr. Gaines increased Plaintiff's anxiety medication and recommended she continue with her other medications. A urine drug screen was performed to ensure compliance. (Tr. 1524).

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that

supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. § 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work

experience in light of her RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920.

## IV.    Discussion:

Plaintiff makes the following arguments on appeal: 1) that the ALJ erred in failing to fully and fairly develop the record; 2) that the ALJ erred in his RFC determination as it was not supported by medical evidence from a treating or examining source. (Doc. 12, pp. 4-10).

Prior to addressing Plaintiff's arguments set forth on appeal, Plaintiff attempts to incorporate by reference arguments made in a prior brief and states there was insufficient room within the Court's page limitations to adequately make her arguments "anew and separately." (Doc. 12, pp. 3-4). The Commissioner asserts that Plaintiff's attempt to incorporate previous arguments is improper and results in an unavailing general objection.

Plaintiff's counsel has been practicing in this jurisdiction for numerous years and is well aware of the proper procedure for requesting an extension, which is a motion to exceed the page limitation.  The Court specifically addressed this issue with Plaintiff's counsel in an October 11, 2017 Order in Baker v. Colvin, No. 5:16-CV-5272-PKH, ECF. 13 (W.D. Ark. Nov. 27, 2017).  Thus, the Court will address only the arguments made in Plaintiff's September 8, 2019, brief, which are properly before the Court.

### A.    Full and Fair Development of the Record:

Plaintiff asserts that the ALJ erred in failing to order mental and physical consultative examinations. (Doc. 12, pp. 6-8).

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995). The ALJ's duty to fully and fairly develop the record is

27

independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). !The duty to develop the record extends only to ordering additional medical examinations and tests if the medical records presented do not provide enough information to determine whether the claimant is disabled. Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986).

In this case, there were adequate medical records for the ALJ to make an RFC determination.  The ALJ's RFC finding was supported by numerous diagnostic images of Plaintiff's cervical, thoracic, and lumbar spine, her abdomen, and her pelvis; treating source opinions; an examining source opinion; and non-examining medical expert opinions.  (Tr. 640-646). As discussed further below, the ALJ considered Plaintiff's treatment records, Plaintiff's own reports in assessing the effects of her impairments on her ability to work, and the opinions of treating physicians, examining physicians, and non-examining medical consultants.

After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period.  Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

### B.    Subjective Complaints and Symptom Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and

aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. In addressing Plaintiff's credibility, the ALJ considered Plaintiff's testimony that she suffered severe injuries as a result of a motorcycle accident in 2012 and that she was unable to work due to continued pain from her injuries. (Tr. 34-35, 641). Plaintiff testified that she sustained a head injury, several fractures to her ribs and spine, and had undergone several surgeries.  Plaintiff stated that she had constant pain in her back that radiated up and down her body. She was barely able to function because of the pain. (Tr. 35, 641). While plaintiff was on pain medication, her pain was not completely relieved. (Tr. 641, 676). Immediately after the accident, Plaintiff had her spleen removed and an anterior and posterior fixation at T11, T12, L2, and L3. (Tr. 34-35, 641).

An August 3, 2012, Function Report, just a few months after Plaintiff's motorcycle accident, stated that Plaintiff had some trouble with personal care, such as difficulty showering, washing her hair, shaving, and getting up from the toilet. (Tr. 165). However, even a few months after the accident, she could prepare simple meals, could do some housework, could do some dishes, and could do some cleaning up after her baby.  (Tr. 166). While Plaintiff was not released to drive yet, she could ride in a car and tried to get out once a day for a brief walk.

(Tr. 167). She shopped in stores with her mother and used motorized carts. (Tr. 167). She reported that she enjoyed spending time with her children while reading and watching movies. (Tr. 168). She interacted with friends by phone and on Facebook weekly. (Tr. 168). She was able to finish what she started on occasion and could follow written and spoken instructions. (Tr. 169). Plaintiff reported some side effects from her pain medication; however, during her testimony, when questioned about particular side effects, she stated that the oxycodone could make her a little tired and that it could possibly keep her from thinking clearly. Yet, Plaintiff testified that she felt alert while taking her medication. (Tr. 667).

With respect to Plaintiff's physical impairments related to her back pain, mid-back pain, and neck pain, medical records show that after Plaintiff's invasive surgery on her back, imaging showed continued improvement in her condition. Plaintiff also overcame a subsequent infection after surgery as well as a bowel obstruction. An impairment which can be controlled by treatment or medication is not considered disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir.2002) (citations omitted).

The Court notes that although Plaintiff suffered from significant pain during her recovery, the medical record establishes a pattern of drug-seeking behavior by Plaintiff. The record is replete with evidence that Plaintiff visited urgent care clinics, emergency rooms, and several pain management clinics, simply to obtain more pain medication, often reporting she had run out of her medication because it had been "stolen." (Tr. 890, 1342, 1360). It is well-established in the Eighth Circuit that "drug-seeking" behavior may be used to discredit a claimant's subjective allegations of disabling pain. Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995). Plaintiff also exhibited behavior that she was not in as much pain as she alleged

30

while seeking emergency treatment and left the hospital against medical advice when she was not prescribed the narcotic drug of her choosing.  (Tr. 1139, 1302, 1423, 1475, 1543).

With respect to Plaintiff's mental impairments, the record demonstrates that Plaintiff was treated conservatively with medication by her general practitioner.  The medical records also show that Plaintiff's medication was helpful at times. Impairments that can be controlled with treatment or medication are not disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002).  Further, Plaintiff reported, and the medical record confirms, that she did not seek treatment from a mental health professional; she did not undergo inpatient or outpatient treatment (other than for drug addiction in 2010); and she did not undergo counseling. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against Plaintiff's claim of disability).

Although it is clear that Plaintiff suffers a degree of limitation, she has not established that she is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

C.    **ALJ's RFC Determination:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3),

416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect h[er] RFC." Id.

In the present case, when determining that Plaintiff could perform sedentary work with postural limitations and non-exertional limitations, the ALJ considered the relevant medical records, the medical opinions from treating, examining, and non-examining physicians, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

Specifically, in his RFC determination, the ALJ gave little weight to the limitations provided by Dr. Kenneth Tonymon and Dr. John Kendrick in their medical source statements because the doctors' determinations were not consistent with the objective medical evidence, including Dr. Tonymon's objective physical examinations of Plaintiff. Plaintiff alleges this was error. In Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012), the Court stated:

> Generally, "[a] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011) (internal quotation marks and citation omitted). However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a

whole." Id. (internal quotation marks and citation omitted). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. at 897–98 (internal quotation marks and citation omitted).

"Because [the doctors'] determination[s] contradicted other objective evidence in the record, the ALJ's decision to give less weight to [their] determination[s] was reasonable." Renstrom, at 1064-65 (citing Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011). See also Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) ("[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight.") (internal quotation marks and citation omitted).  Both doctors' opinions were in the form of Medical Source Statements, which were checkbox forms.  A treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record. See Martise v. Astrue, 641 F.3d 909, 926 (8th Cir. 2011) (citing Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004)).

In sum, the ALJ declined to give controlling weight to Dr. Tonymon and Dr. Kendrick's opinions for good and well-supported reasons. See Goff v. Barnhart, 421 F.3d 785, 790–91 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount [the treating physician's] opinion.").

The ALJ also considered the repeated medical imaging conducted on Plaintiff's upper, middle, and lower spine, as well as her abdomen and pelvis.  After surgery from her accident, most of Plaintiff's imaging showed no acute findings, good alignment, and stable post-operative changes. (Tr. 205-206, 571-572). Her subsequent MRSA and bowel obstruction improved greatly with treatment. The record showed that as Plaintiff progressed with her

healing, her physical examinations were normal, often showing normal range of motion in her back and extremities, normal gait, the ability to stand without difficulty, and normal sensation. (Tr. 205, 496).  Despite being on a narcotic pain medication regimen, Plaintiff continued to seek an unusual amount of pain medication from her treating physicians, from pain specialists, from urgent care clinics, and from emergency room physicians. The Court notes that several pain specialists refused to treat her based on evidence that she had a history of drug abuse[2] and was simply seeking to obtain narcotic pain medication. (Tr. 1384, 1474, 1527).

With regard to Plaintiff's mental conditions, the ALJ considered Dr. Efird's consultative evaluation from September 14, 2012, where Dr. Efird opined on Plaintiff's adaptive functioning and offered diagnoses of depression, anxiety, opiate dependence in partial remission, and personality disorder. (Tr. 434). Plaintiff reported to Dr. Efird that she had been on psychiatric medication for the last four to six months and that it had been beneficial to her. (Tr. 432). Dr. Efird opined that Plaintiff communicated and interacted in a reasonably socially adequate manner; communicated in reasonably intelligible and effective manner, with a tendency to qualify responses at times; had the capacity to perform basic cognitive tasks required for basic work-like activities; appeared able to track and respond adequately for purposes of the evaluation; completed most tasks and showed no remarkable problems with persistence; and completed most tasks within an adequate time frame and should have the ability to perform basis work-like tasks within a reasonable time frame. (Tr. 434-435).

Plaintiff also asserts that the ALJ erred in rejecting the GAF score of 45-55 offered by Dr. Efird.  (Doc. 12, p. 6). A GAF score is a numerical assessment between zero and one

---

[2] Plaintiff testified that she used methamphetamine for years; had two arrests for possession which resulted in probation twice in 2003; and underwent drug treatment for ten months in 2010. (Tr. 29-30). Other than a relapse in 2012, Plaintiff testified she had not used drugs since completing rehab in 2010.  (Tr. 674).

hundred that reflects a mental health examiner's judgment of an individual's social, occupational, and psychological function. Kluesner v. Astrue, 607 F.3d 533, 535 (8th Cir. 2010); Jones v. Astrue, 619 F.3d 963, 973 (8th Cir. 2010) ("The GAF score is a subjective determination that represents 'the clinician's judgment of an individual's overall level of functioning' ") (internal citation omitted). We have long held that, while occasionally helpful, a particular GAF score does not warrant a finding of disability, and a failure to analyze GAF scores alone is not proper grounds to reverse a disability determination. Jones at 973. (citing with approval cases from the United States Court of Appeals, Sixth Circuit) (internal citation and quotation omitted). The Court is cognizant of cases where the Eighth Circuit has held that GAF scores, especially those at or below 40, must be carefully evaluated when determining a claimant's RFC. See, e.g., Conklin v. Astrue, 360 Fed.Appx. 704, 707 (8th Cir. 2010) (reversing and remanding in part because the ALJ failed to consider a claimant's GAF scores of 35 and 40); Pates-Fires v. Astrue, 564 F.3d 935, 944-45 (8th Cir. 2009) (holding that the ALJ's RFC finding was not supported by substantial evidence in the record as a whole, in part due to the ALJ's failure to discuss or consider numerous GAF scores below 50). We return to the primary charge of this Court, however, and as long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015). As the Eighth Circuit has long held, we must affirm the ALJ's decision if, after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings

of the ALJ. Id. Here, the Court finds that the ALJ did not err in his consideration of the GAF score along with all other evidence obtained in the medical record.

The ALJ also considered the opinions of the non-examining medical consultants. (Tr. 642-643). Dr. Norcross found that Plaintiff was capable of light work with postural limits and occasional bilateral overhead reaching limits; however, the ALJ gave his opinion little weight and determined that Plaintiff was more limited than determined by Dr. Norcross. (Tr. 429, 642). Dr. Abesie Kelly, Ph.D., also a non-examining medical consultant, found that Plaintiff had some moderate limitations in the area of difficulties in maintaining social functioning as well as in the area of difficulties in maintaining concentration, persistence, or pace. After review of the medical records before her, Dr. Kelly concluded that Plaintiff was able to perform work where interpersonal contact was incidental to work performed, e.g. assembly work; complexity of tasks was learned and performed by rote, few variables little judgment; and supervision required was simple, direct, and concrete (unskilled). (Tr. 440). The ALJ assigned great weight to Dr. Kelly's assessment. (Tr. 643). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007), citing Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (internal citations omitted).

Upon careful review of the record as a whole, the Court finds there was sufficient evidence in the record from which the ALJ could make an informed decision concerning Plaintiff's disability claim. Further, "[r]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488

(8th Cir. 1995). Plaintiff fails to establish any prejudice from the ALJ's decision not to obtain any further medical evidence.

Furthermore, after a review of the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination of sedentary work with postural and non-exertional limitations.

### D.    Hypothetical Question to the Vocational Expert:

Plaintiff alleges there was error by the vocational expert where she was unable to translate how the use of oxycodone would reduce the number of jobs available in the national economy. (Doc. 13, p. 10). However, Plaintiff testified that her medications did not have any side effects on her, but after counsel suggested the potential side effects of grogginess or sleepiness, Plaintiff noted that it could make her "kind of tired."  However, Plaintiff stated that she also felt alert. (Tr. 667). Plaintiff also denied having any side effects from her medication during her evaluation with Dr. Efird. (Tr. 432).  Furthermore, Dr. Daut and Dr. Gaines also noted in their clinic records that Plaintiff was not experiencing any side effects from her medication. (Tr. 882, 886, 1453, 1465, 1503, 1511, 1521).

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as an addresser, a document preparer, and a table worker.  (Tr. 647).  Pickney v. Chater, 96 F.3d

294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

## V.      Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 12th day of June, 2020.



/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE